UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | |
|---|---|
| TAMMY B. HOOBLER, ) | |
| ) | |
| Claimant, ) | |
| ) | |
| vs. ) | Civil Action No. CV-12-S-1061-J |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner, Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Claimant, Tammy Hoobler, commenced this action on April 6, 2012, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner affirming the decision of the Administrative Law Judge denying her claim for a period of disability, disability insurance, and supplemental security income benefits.  For the reasons stated herein, the court finds that the Commissioner's ruling is due to be affirmed.

The court's role in reviewing claims brought under the Social Security Act is a narrow one.  The scope of review is limited to determining whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and whether correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Tieniber v. Heckler*, 720 F.2d 1251, 1253

(11th Cir. 1983).

Claimant argues that the Commissioner's decision was neither supported by substantial evidence nor in accordance with legal standards. Specifically, claimant asserts that the ALJ: (1) should have found her to be disabled under Listing 12.05C; (2) improperly considered the opinion of the state agency psychological consultant; (3) improperly evaluated her past relevant work and skill levels; and (4) improperly assessed her credibility. Upon consideration of the record and the parties' briefs, the court concludes that these contentions are not correct, and the Commissioner's decision should be affirmed.

**A.    Listing 12.05C**

Listing 12.05C, governing mental retardation, provides as follows:

> *Mental Retardation.*  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

20 C.F.R. pt. 404, subpt. P, appx. 1, § 12.05 (listings) (all emphasis in original).

It appears undisputed that claimant has "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* Thus, the real issue is whether claimant has a valid IQ score of 60-70, with evidence that her intellectual impairment began before she reached age 22. *See id.*

Claimant asserts that the ALJ should have found those criteria to be satisfied based upon the assessment of Alan D. Blotcky, Ph.D., who submitted a Psychological Evaluation Report dated February 18, 2010, in support of claimant's separate application for assistance from the Alabama Department of Rehabilitation Services. Dr. Blotcky stated that claimant spends most of her time doing light housework and resting, and that she did not cook, socialize with others, or have any hobbies or special interests. Dr. Blotcky's clinical observations were as follows:

> Mrs. Hoobler was appropriately attired and nicely groomed for this evaluation. She was wearing casual clothes that were clean and neat. She did not have on make-up or jewelry. Mrs. Hoobler complained of pain in her back. She voiced no other somatic concerns. Mrs. Hoobler demonstrated logical and orderly thinking. Her thought processes were concrete and simplistic. Her speech was normal. Her abstract thinking was poor. Her memory functioning was accurate. Mrs. Hoobler seemed extremely depressed to me. Her affect was restricted. She looked tired and worn. She talked in a monotone. Many of her verbalizations were morbid in content. Her energy level was low. Mrs. Hoobler is not psychotic. She does not have a thought disorder. This woman's judgment is grossly intact. Her insight is good.[1]

---

[1] Tr. 412.

Dr. Blotcky administered WAIS-III intelligence testing, which revealed a Verbal IQ score of 65, a Performance IQ score of 65, and a Full Scale IQ score of 62. Claimant also received a score of 42 on the Beck Depression Inventory, indicating the presence of severe depression. Dr. Blotcky assessed claimant as suffering from major depressive disorder, recurrent, severe, without psychosis; mild mental retardation; multiple medical problems; and a GAF score of 40, indicating major impairment in certain areas. He recommended that claimant receive regular psychiatric treatment. He also stated that claimant had been functioning at the mildly retarded intellectual level since an early age, and that her intellectual impairments would continue to be a lifelong problem, resulting in her inability to independently manage her financial affairs. Dr. Blotcky believed claimant's test scores to be valid, and stated that her prognosis was "very poor because of the combination of an affective illness and mental retardation."[2]

The ALJ assigned only little weight to Dr. Blotcky's findings about mental retardation and severe depression. He reasoned:

> No other examining, and no treating, medical source has provided similar findings; Dr. Blotcky's assessment is directly at odds with that of another consultative psychological examiner, Dr. H. Jerry Gragg, PhD . . .; and the level of intellectual deficit assessed by Dr. Blotcky is inconsistent with the claimant's long work record, including work as a

---

[2] Tr. 410-13.

4

> shift leader at McDonald's, with the claimant's ability to read and write, with the lack of any special education placement . . ., with the rather full range of the claimant's daily activities . . ., and with the observations of the undersigned at the hearing, a hearing in which the claimant proved to be quite articulate, informed, and responsive.[3]

Claimant argues that the ALJ should have given more weight to Dr. Blotcky's assessment.

Social Security regulations provide that, in considering what weight to give *any* medical opinion (regardless of whether it is from a treating or non-treating physician), the Commissioner should evaluate: the extent of the examining or treating relationship between the doctor and patient; whether the doctor's opinion can be supported by medical signs and laboratory findings; whether the opinion is consistent with the record as a whole; the doctor's specialization; and other factors. *See* 20 C.F.R. § 404.1527(d). *See also Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986) ("The weight afforded a physician's conclusory statements depends upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence as to claimant's impairments.").

Claimant first takes issue with the ALJ's consideration of plaintiff's work record as a reason to reject Dr. Blotcky's findings. Claimant points out that the vocational expert classified claimant's past work, including her job at McDonald's,

---

[3] Tr. 18-19 (citations to the record omitted).

as unskilled, and asserts that the work "hardly demonstrates intellectual abilities above the mentally retarded range."[4] It is true that the vocational expert testified that claimant's past work was unskilled,[5] but so did the ALJ.[6] Therefore, there is no inconsistency. Further, even if the McDonald's job was properly classified as unskilled for transferability purposes, and even if claimant was a shift leader instead of a store manager, her job duties, including limited management responsibility, are a reflection of her intellectual abilities. The ALJ did not err in considering claimant's past work, among other factors, in deciding how much weight to give to Dr. Blotcky's assessment, and substantial evidence of record supports the ALJ's decision.

The ALJ also properly considered claimant's ability to read and write. It is beyond dispute that the ability to read and write is relevant to the determination of mental retardation. There is evidence that claimant's ability to read and write is at least somewhat limited, as she testified during the administrative hearing that she only finished the eighth grade, was in special classes for speech and reading in the seventh and eighth grade, could only read "so much," and could "scribble" to write.[7] Even so, there is other evidence that claimant *can* read and write at some level,

---

[4] Doc. no. 8 (claimant's brief), at 9.

[5] Tr. 48.

[6] Tr. 23 ("Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled . . . .")

[7] Tr. 45.

including claimant's own hearing testimony, her statements on her disability report,[8] and her description of her past job as requiring paperwork, computer use, counting money, writing, and preparing reports.[9] Thus, it cannot be said that the ALJ's consideration of claimant's ability to read and write in deciding to reject Dr. Blotcky's assessment was unsupported by substantial evidence.

Next, claimant objects to the ALJ's characterization of Dr. Blotcky's assessment as being "at odds" with the assessment of Dr. Gragg. Dr. Gragg evaluated claimant on November 29, 2008, "using standard mental status examination procedures, many of which are derived from the Wechsler scales."[10] Dr. Gragg stated that claimant

> was well oriented in all spheres, and no appreciable impairments in memory functioning were noted. Her abstract reasoning capacity was average, but her judgment for hypothetical situations and her insight were fair, at best. Her attention and concentration capacity were good. Her fund of general information was consistent with her educational background and *consistent with intellectual level estimated to lie in the low-average range of general intelligence.*[11]

Dr. Gragg's final conclusions included the following statements:

> It seems that [claimant] would be able to respond appropriately to supervision and she seems to have adequate social skills to relate to

---

[8] Tr. 150.
[9] Tr. 152.
[10] Tr. 318.
[11] *Id.* (emphasis supplied).

others. She has adequate intellectual functioning to be able to understand, remember and carry out instructions. It also appears that she would be able to handle work-related stressors effectively. It is noted that she began to experience depression approximately four years ago, but was able to work satisfactorily until July 2008, when she began to experience physical problems.[12]

Claimant challenges the ALJ's consideration of Dr. Gragg's assessment because "there is nothing in Dr. Gragg's report to suggest that he was asked to examine, or did examine, [claimant]'s intellectual abilities."[13] That argument simply is not supported by the record, as it clear from Dr. Gragg's report that he evaluated claimant's intellectual functioning and determined that she was operating at the low-average level, not the mentally retarded level. Thus, the ALJ was entitled to rely upon Dr. Gragg's contradictory opinion in rejecting Dr. Blotcky's assessment, and his decision to do so was supported by substantial evidence.

Finally, claimant asserts that the ALJ should have recontacted Dr. Blotcky if he had any doubt about Dr. Blotcky's testing results or other opinions. Claimant cites 20 C.F.R. § 416.919p, which states, in pertinent part, that if a report from a consultative examiner is "inadequate or incomplete," the Commissioner should recontact the examiner, "give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report." 20

---

[12] Tr. 319 (alteration supplied).
[13] Doc. no. 8, at 9 (alteration supplied).

8

C.F.R. § 416.919p(b). That provision does not support claimant's argument. First, Dr. Blotcky was not a consultative examiner engaged by the Commissioner; instead, he submitted his report to the Alabama Department of Rehabilitation Services. Moreover, the ALJ did not find Dr. Blotcky's report to be inadequate or incomplete under the regulation; he simply concluded that Dr. Blotcky's findings were inconsistent with other evidence of record and assigned them little weight. There is no rule that an ALJ must always recontact a medical source for more explanation before rejecting that source's opinion.

In summary, the ALJ's conclusion that claimant did not meet the requirements of Listing 12.05C was supported by substantial evidence and in accordance with applicable legal standards.

**B.     State Agency Physician**

Next, claimant asserts that the ALJ improperly considered the assessment of Eugene Fleece, PhD, the non-examining, non-treating, state agency psychological consultant. Dr. Fleece stated that, based primarily upon Dr. Gragg's assessment and claimant's own activity reports, she suffered from mild depression, not otherwise specified, that was treated by Cymbalta.[14] He did not indicate that claimant suffered

---

[14] Tr. 329. *See also* Tr. 338 ("Dr. Gragg's CE is our only source of much information on cl's psych condition.").

from mental retardation.[15] Dr. Fleece indicated that claimant would experience mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no extended episodes of decompensation.[16] On a Mental Residual Functional Capacity Assessment form, Dr. Fleece indicated that claimant was not significantly limited in most areas. She would be moderately limited in the ability to maintain attention and concentration for extended periods, and in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.[17] Dr. Fleece concluded that claimant could concentrate for two-hour periods on simple, familiar, or repetitive tasks, and she might miss one day of work each month due to her psychological problems.[18]

The ALJ afforded Dr. Fleece's assessment significant weight as the opinion of a specialist that was based upon a comprehensive review of the available record and uncontradicted by the opinion of any treating source.[19] Claimant objects to the ALJ's decision because Dr. Fleece did not examine claimant, and he did not review Dr.

---

[15] Tr. 330.
[16] Tr. 336.
[17] Tr. 340-41.
[18] Tr. 342.
[19] Tr. 22.

Blotcky's assessment because it had not yet been created. Just because Dr. Fleece did not examine claimant does not mean that the ALJ cannot favor his opinion over that of an examining source. To the contrary, Social Security regulations provide that the opinions of state agency psychological consultants are entitled to substantial consideration. *See* 20 C.F.R. §§ 404.1527(e)(2)(i) & 416.927(e)(2)(i) (stating that, while the ALJ is not bound by the findings of a State Agency psychological consultant, the ALJ should consider such a consultant to be both "highly qualified" and an "expert" in Social Security disability evaluation). *See also Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981) ("The Secretary was justified in accepting the opinion of Dr. Gordon, a qualified reviewing physician, that was supported by the evidence, and in rejecting the conclusory statement of Dr. Harris, a treating physician, that was contrary to the evidence."); *Surber v. Commissioner of Social Security Administration*, No. 3:11–cv–1235–J–MCR, 2013 WL 806325, *5 (M.D. Fla. March 5, 2013) (slip copy) ("State agency medical consultants are non-examining sources who are highly qualified physicians and experts in Social Security disability evaluation, and their opinions may be entitled to great weight if supported by evidence in the record."). The ALJ's determination that Dr. Fleece's opinion was based upon a thorough review of the record and consistent with the other medical evidence was supported by substantial evidence.

### C. Claimant's Past Relevant Work and Skill Levels

Claimant also asserts that the ALJ improperly substituted his own opinion of claimant's past relevant work and skill levels, in contradiction to the testimony of the vocational expert. As discussed at pages five and six, *supra*, the ALJ properly considered claimant's past relevant work.

### D. Credibility

Finally, claimant asserts that the ALJ improperly discredited claimant's testimony based on her daily activities. One reason for the ALJ's rejection of Dr. Blotcky's assessment was that it was inconsistent with "the rather full range of the claimant's daily activities . . . ."[20] The also found that claimant had only mild restriction of daily activities due to depression, stating:

> The evidence as a whole reflects that the claimant functions independently in her activities of daily living and require little assistance. Dr. Gragg noted that the claimant did not require assistance with personal hygiene or self-care activities, and found no indication of significant restriction of activities or constriction of interests secondary to psychological/psychiatric issues.[21]

The ALJ also evaluated claimant's credibility in determining her residual functional capacity. He found that, while claimant's medically determinable impairments could reasonably be expected to cause some of her subjective symptoms, claimant's

---

[20] Tr. 19.

[21] *Id.*

statements about the intensity, persistence, and limiting effects were not fully credible.[22] One reason for that decision was that "claimant has a rather wide range of daily activities, one inconsistent with her current claim of total disability . . . ."[23]

The court concludes that the ALJ's evaluation of claimant's credibility, and particularly her daily activities, was in accordance with applicable law and supported by substantial evidence. *See Marbury v. Sullivan,* 957 F.2d 837, 839 (11th Cir. 1992) ("*After* considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence.") (citing *Wilson v. Heckler,* 734 F.2d 513, 517 (11th Cir. 1984)) (emphasis supplied). In addition to the ability to maintain self-care and hygiene noted by Dr. Gragg, claimant reported that she gets her youngest daughter ready for school, helps her with homework, picks her up from school, prepares meals on a weekly basis, washes dishes, does laundry, goes outside twice a day, drives a car, shops for food, and watches television.[24] These activities, admittedly, are somewhat limited, and claimant indicated that her ability to perform the activities on a regular basis has diminished over time. It also cannot be ignored that the Eleventh Circuit has disavowed the notion that "participation in everyday activities of short duration, such as housework

---

[22] Tr. 22.
[23] *Id.*
[24] Tr. 161-64.

or fishing, disqualifies a claimant from disability." *Lewis v. Callahan,* 125 F. 3d 1436, 1441 (11th Cir. 1997). That does not mean, however, that a claimant's ability to carry out daily activities should not be considered at all in the disability determination process. To the contrary, Social Security regulations expressly provide that such activities *should* be considered. *See* 20 C.F.R. § 404.1529(c)(3)(i) (listing "daily activities" first among the factors the Social Security Administration will consider in evaluating a claimant's pain). Here, claimant's daily activities were not the only factors the ALJ considered in evaluating the credibility of claimant's pain allegations. The ALJ also considered the consistency of claimant's allegations with the medical evidence of record, including the reports of consultative examiners. The court concludes that the ALJ's overall evaluation of claimant's credibility was consistent with applicable legal standards and supported by substantial evidence of record.

Based on the foregoing, the decision of the Commissioner is AFFIRMED. Costs are taxed against claimant. The Clerk is directed to close this file.

DONE this 14th day of March, 2013.

_____
United States District Judge